This next case is 417-0664, Hall v. Cipolla et al. For the apparent is Laird Osmond. You are he, sir? Yes, sir. And for the appellee is Joshua Vinson. Sir, he is. Okay, Mr. Osmond, you may proceed, sir. Thank you, Your Honor. May it please the Court? Counsel. Counsel. This is a medical malpractice appeal unlike any other. It is not complicated. It is not nuanced. It does not involve a battle of the experts. Defense counsel has admitted the applicable standard of care, and defense counsel has made the admission that Dr. Cipolla's collective judicial admissions at trial, quote, conceded that certain isolated factors uncovered during the history exam and EKG on Jason Hall were suspicious for chest pain of cardiac origin, close quote. Note, the factors were not at all isolated. They were all contemporaneously combined. However, when these two admissions by counsel are combined, a non-rebuttable prima facie case of defendant's medical negligence is established, not to mention Dr. Cipolla's admissions as to proximate cause and damages. That's true if they're judicial admissions, not evidentiary admissions. Well, I think we've gone beyond that now. I think counsel, through their briefs, have framed this issue for the Court. I don't understand what you mean we've gone beyond it. We've gone beyond the trial testimony directly of Dr. Cipolla and stated in the briefs before this Court that he was aware of factors suspicious for chest pain of cardiac origin. Are you abandoning your argument that these were judicial admissions? I am not. I'm only saying that counsel has combined those into an admission in the briefs for this Court. I think that all of those statements by Dr. Cipolla at trial were in fact judicial admissions and stand by themselves. They, by virtue of taking all those, saying it's conceded. And that's my point here is we've now taken that all and condensed it by virtue of that which they've decided to do in framing their arguments before this Court. If we disagree with your claim that these are judicial admissions, what's the effect of that? Well, I believe that regardless they are admissions. And I think it has a lot to do certainly as to the JNOV versus manifest weight. But I see no basis for these not to be considered judicial admissions when they're read in context to what this case involves. And the fact that this standard of care had a very specific intent. And that intent was not to have the prompt care physicians acting as cardiologists in their bump and bruise clinics. And when you go forward in the evidence and find that their own website, OSF, told people don't even come to our prompt care clinics if you have chest pain. Because they considered that to be a condition which was potentially life-threatening. And they didn't want doctors untrained in the field of cardiology deciding to become cardiologists and rule out suspicious factors. What becomes paramount for this Court is that they have admitted, meaning they counsel on behalf of their client, that there were suspicious factors discovered during the process of seeing Dr. Jason Hall in the prompt care clinic. And then because they also admit that the standard of care in this case is that Dr. Cipolla recognized that if a patient's chest pain was suspicious of having a cardiac origin, the standard of care would be to refer the patient to the emergency room rather than try to diagnose it. And this Court should give specific attention to the admonition in the admitted standard of care rather than try to diagnose it. It meaning the chest pain. This necessarily mandated that Dr. Cipolla could not ignore or rule out, acknowledge suspicious chest pain symptoms once they were identified. Or he would be trying to diagnose it. Which Dr. Cipolla himself repeatedly, judicially in the trial record, admitted he was not allowed to diagnose. This prohibition not to diagnose made the OSF standard of care an objective standard, specifically intended to prevent its prompt care doctors from acting in the capacity of a cardiologist when patients presented with potential life-threatening conditions of chest pain suspicious of cardiac origin. Defendants would have this Court believe that the OSF standard of care was a subjective standard, thus enabling Dr. Cipolla to freely exercise his non-cardiology specialty to decide to ignore factors such as symptoms suspicious for chest pain of cardiac origin and decide, in fact diagnose, whether chest pain was in fact of a cardiac origin. This argument would make the standard of care internally contradictive. So the jury heard all of this, didn't it? Why didn't the jury decide that the defendants' experts were more believable when they said there was no violation of the standard of care? Absolutely not. The reason for that being is the standard of care is triggered by awareness of suspicions. A judicial admission that you were aware, and there are at least a half a dozen that he states this. That goes back to the point of, is this a judicial admission? Correct, and I say that they are because they're unequivocal, they're facts, they're concrete within his knowledge. Why are the opinions, and opinions aren't ever judicial admissions, are they? Well, they're admissions of a suspicious factor. That's a fact. He admits that there were things he found that were suspicious factors. Did he say that in each instance that these were suspicious, or that they can be suspicious, and then would explain what he meant by that? No, I don't think he explained what he meant. I think he simply said he acknowledged that, yes, these findings can be suspicious of chest pain of cardiac origin. And when you consider the standard of care doesn't want him to go beyond that, because then he's going into an area of being a cardiologist. That's the whole purpose of the standard of care. If you were going to just let him diagnose it, you wouldn't even need this prohibition in the scope of services. It would be meaningless. And in the evidence in the case, he has admitted, I was aware of things that were suspicious that could make this of cardiac origin. At that point, Your Honors, the standard of care kicked in. And when it did, it required him to transfer the patient where a cardiologist could make that decision. Wouldn't the argument essentially be that anyone who then shows up at a clinic of this kind with chest pains has to be referred to a cardiologist? Oh, no. I'll give you an example. Let's assume a man comes in with a fork sticking out of his chest. But he has no factors suspicious of a cardiac origin. He has a clean EKG. That palm care doctor is free to diagnose that the cause of his pain was his criticism of his wife's cooking. But he's not free if that EKG, as in this case, objectively comes back and states, it cannot rule out that Jason Hall was not having a cardiac event while he was in the care of Dr. Cipolla. And with that suspicion objective, he then proceeded on to diagnose him, negatively saying he didn't have any cardiac problem, and positively that it was musculoskeletal. If you recall, in the record, Dr. Cipolla was asked this question, I think you told me that if you found any more suspicion after taking the EKG, that you should refer him to the emergency room, correct? Answer, yes. However, despite the objective suspicion on the printout of the EKG itself, stating it couldn't rule out that he was having a heart attack at that point or a myocardial event, Dr. Cipolla didn't refer, but rather he ruled out the EKG finding and all the other suspicious findings which we have talked about, and diagnosed Jason Hall with muscle pain. This conduct was blatantly in violation of the standard of care. It is the chest pain that merely has to be suspicious of cardiac origin. Well, what about the plaintiff or defendant's experts who said it wasn't? Once Dr. Cipolla has admitted he was suspicious, it's irrelevant if the experts say they weren't suspicious, because they're not the person triggering the standard of care. Whether they were suspicious or not, it's irrelevant. You mean they shouldn't have been permitted to testify? Well, the fact is their testimony doesn't influence what this court should be looking at today. Well, this goes back then to the, if we disagree that this constitutes a judicial admission, then the jury is free to weigh the competing expert testimonies, are they not? No, I think that even evidentially you have so many evidentiary admissions that then it's against the manifest way. Well, I'm not, I'm trying to put myself in the position of the jurors and understand they heard from two different defense experts. Did they not say what happened here was not a violation of the standard of care? Well, they didn't rebut that he was suspicious. Counsel, I try to ask my questions in a specific way. They heard from two experts who said this was not a violation of the standard of care. Correct. Why shouldn't the jurors be able to accept their testimony if they found it more believable than the plaintiff's argument? Because it is our position that the admissions of Dr. Cipolla are irrebuttable. They are judicial. There's no argument that they could not be. They are definitive, they're concise, they're factual, they're within the law. Counsel, can we disagree with your assessment that the judicial admissions, you lose because that's all you got? Well, I don't lose. I have an argument of manifest weight because the record is replete with admissions evidentially that he was suspicious, and their experts did not rebut those admissions. They didn't say Dr. Cipolla wasn't suspicious. They just said we wouldn't be suspicious, therefore we don't believe he violated the standard of care. And that's an important distinction you raise, Your Honor, because the fact that they weren't suspicious is not appropriate to imply that therefore the jury could ignore the admissions of Dr. Cipolla that he was because that is the linchpin that turns the standard of care. Otherwise, the standard of care is meaningless. And when Dr. Cipolla admitted he found any more suspicion, any more that he should refer, and he still did not, it is our position that when you read the underlying evidence, which underlies the standard of care, that based upon Serrano and Dunning, which said this court in order to determine, to give meaning consistent with the context in which the judicial admissions are found, you must consider the other testimony presented. And the other testimony clearly showed they don't want chest pain patients coming to their clinics. And that's why their website said that. And that's why they set up an objective standard that said, okay, if they do show up, then they better not have any suspicious factors because then they should go directly to a cardiologist. It is his job to determine whether or not those suspicious factors are or are not of cardiac origin. Didn't the doctor do that in this case? Pardon? Isn't that precisely what the doctor did? No, he did not. In fact, once he was aware of suspicious symptoms, he went on to diagnose him, which they admitted standard of care before the court says you can't do. He went beyond it. And it's important to consider, Your Honor, that it is the chest pain that merely has to be suspicious of cardiac origin to require a referral. It is not the doctor believing the chest pain is of cardiac origin that requires referral. They want their prompt care doctors to do what they're there for, you know, bumps and bruises, scrapes and minor injuries of that, not ruling out EKGs of a patient who has obvious signs that there may be of cardiac origin, arm and neck pain, tachycardia, the hypertension, obesity, et cetera. And that all precedes an EKG which tells him, tells him, we think this may be a cardiac event. And he overrules that. He's not qualified to do it. They don't want him to do it, and that's why in the scope of services, it has that vocation. What about the argument from the defense that you never asked the trial court to consider this testimony's judicial omission so that the court never addressed it directly? Well, the court did in the post-trial motion. Well, but time and data comes up. I agree with you, Your Honor, that it would have been a nicer presentation, but it does not change our legal standing here before you, and that is 1202 was specifically done because of these types of situations. And the court, the trial court, even conceded that we waived nothing. I can speculate that had I raised it at the time, it would have been dealt with the same way it was dealt with at post-trial motion. But we preserved our right to argument in front of you. What did the court say at the post-trial motion about your claim that this is a judicial omission? I'm sorry? What did the trial court say at the hearing on the post-trial motion about it? The trial court did not believe they're judicial omissions. Why? What did she say? Not really explained. But she felt that the jury had a right to decide what the question of fact. If this, if the doctrines in this. Well, why is it that you've, given the circumstances, all our sympathies with the trial judge, okay? We've got 20 years' experience as a trial court between us, the three of us. Right. I'm troubled by the idea that in a post-trial motion the argument is made, gee, these were judicial omissions, and the case should have been essentially taken away from the jury at that point. Right. And when this is not an argument that was made at the time, so that evidence was presented that maybe shouldn't have been presented, arguments were made that maybe shouldn't have been argued, this sounds to me like a forfeiture situation. Why shouldn't it be viewed as such? Well, because the fact that we didn't do it at the time, even the judge recognized this. Your Honor, in the course of this trial, if you've read the record, this is a brick-by-brick process coming together, where ultimately it didn't necessarily see itself as what it was until the end of the trial. I don't understand what that means. Well, it means that the evidence was coming in through the course of different testimony, and by the time the case came to an end, and I agree with you, I think that in hindsight raising this in the motion for directed finding would have been a proper way to do it, but it wasn't improper such that this court can look back and say, okay, now we're going to ignore the argument because 1202 gives us this right, and they were judicial admissions, and the fact that they're not rebuttable. But again, I say to you that we're really kind of beyond that because in the briefs, counsel has admitted, we have judicial admissions before this court, and they say to this court that Dr. Cipolla conceded. There were suspicious factors of chest pain of cardiac origin, and they have conceded before this court that their standard of care requires that if there's knowledge of that, you cannot diagnose, and we have no doubt that he did diagnose and he didn't refer. This is a very straightforward, and that's why my opening said to you, Your Honor, that it's not nuanced and complicated. It can be made nuanced and complicated, but under 1202, we have the right to argue the very same things that we would have argued at trial. Was Dr. Cipolla deposed? Yes. And in his deposition, did he testify substantially consistently with his trial testimony? Yes, I impeached him. Well, then the argument that what he was going to say and whether or not it constituted judicial admission was known by you prior to trial, was it? Well, I understand that, but I also stand on 1202. The evidence is the evidence, and this is a de novo hearing, right? This isn't where you'll restrict it. Well, this is an objection made to it. What you're essentially arguing is if this was a judicial admission, then a certain evidence presented at trial was improper, and arguments made at trial would be improper as well because you couldn't present evidence or arguments to challenge a judicial admission. Yet, you made no such argument, so that was all presented. Now, after the fact, you're arguing to the judge, Judge, this was all proper, and you should grant a judgment on OB. Well, I don't think so. Why isn't that forfeited? I don't, the trial court didn't even consider it a forfeiture. See, counsel, I didn't ask you what the trial court said. I asked you why isn't it forfeited. Because 1202 preserves it. And more importantly, again, and I think the court steps over this, the briefs that are in front of this court have admitted these issues before the court. Where? Well, number one, at page two of their post-trial motion is the quote concerning Wait a minute, you said the briefs. It's in there too, but it's not as concise as it is in their post-trial motion. Either way, it's the right I'm just taking you to Sure, what I really meant to say Let me finish my question, please. I'm taking you at what you just said. You've said several times now, in their briefs, they admit. So point to me, please, where they admit in their briefs. The standard of care is admitted in their brief at page six. The statement that I read to the court, and I can give you where it is in the brief. The court says Dr. Cipolla did not have a suspicion that Hall's chest pain was cardiac in origin? Pardon? No. Dr. Cipolla recognized that if a patient's chest pain was suspicious of having a cardiac origin, the standard of care would be to refer the patient to the emergency room rather than to diagnose it. That if the patient's chest pain was suspicious, he goes on. However, if the chest pain was not suspicious of having a cardiac origin, then his job as a prompt care physician was to diagnose the pain. They argue not that he admits that these things were in fact suspicious for cardiac origin. I think we're confused. Can I finish my statement, please? Yes. I don't see them admitting anything that you are arguing. I see them saying we acknowledge that the doctor indicated that if the question were worded a certain way, he acknowledges that that may in fact be suspicious. However, he then goes on to explain why it was not suspicious to him. That was only the standard of care admission. That wasn't the admission which they made in their post-trial motion and avert to in their brief. But it was concisely stated on page two of their post-trial motion. Counsel, your time is up. You have an opportunity to address this again in rebuttal. Thank you. Okay, Mr. Vinson? Thank you. May it please the Court, Josh Vinson on behalf of Dr. Cipolla and OSF Healthcare System. I do want to kind of pick up with your questions, Justice Steigman, about the forfeiture issue. Because, you know, when we talk about the judicial admission and not getting yet to that point about whether it was or not, but even if you assume that it was, procedurally what you've pointed out is that, you know, the whole point of a judicial admission is to remove a fact from complete contention in the case. And once you do that, that's when you can say, okay, the jury should not hear any further evidence on a particular point. And so procedurally, I think the Court has picked up on this, is that if you're going to take the position that something is a judicial admission, I don't think you can do it after the jury is gone in the post-trial motion. That's the question I was getting at. Do you have any case law that addresses this strange situation? You know, the closest case that we could come up with is the one cited in the very beginning of our brief on the forfeiture issue. I'm not thinking of the name right now, but it's a Fifth District case. All I remember offhand now is that Justice Lewis wrote the decision. But that was the case that talked about the point that you need to bring it to the Court's attention immediately and have them rule on it because, first of all, it's a discretionary call to be made. And I think the whole point of that decision was that if you're going to make the argument that it's a judicial admission, then there's no point. Is it Dunning? Is that the case you're talking about? He cites it a lot. No, I think that's the – no, that was Justice Goldenherz's decision. That's a Fifth District case. Yeah. But that's, you know, that's essentially what I'm trying to get at. The whole idea of judicial admission is to both limit, in the first instance, the evidence, and then, as well, argument because you can't argue against a fact that has been traditionally admitted. Right. You know, the whole point of it is to remove a fact from issue. You heard Mr. Osmond say repeatedly the trial court recognized it as such after the fact. I'm not sure about that. What's your sense of the hearing of the post-trial motion when this judicial admission discussion came up? Oh, no, I think the judge – I mean, the judge approached it – I don't think she took the position initially about forfeiture. I don't think the judge looked at it from that perspective. I think the judge looked at it from what some of your earlier questions were, was taking the testimony as a whole and whether the doctor took the time to explain his answers, as I think the court also acknowledged in its questions. There were explanations given to the points that Mr. Osmond contends were judicial admissions. And on top of that, you're supposed to also take into account the other testimony that was given in the case in trying to assess it. I think Judge Foley also recognized that, as this court has too in its questions, that when you're talking about a question of standard of care and breach of the standard of care, those are by definition, that's matters of opinion. These are not matters of concrete fact, which is what judicial admissions deal with. And even the case, the Fifth District case that you mentioned, Dunning v. Deinergy, that the plaintiffs do rely upon for this argument. In that particular case, it's a situation where a man was crushed by a forklift, and one of the issues was the fact that the forklift had casters that could be locked. And so the person who was operating it admitted that he did not know that the casters could be locked, and his boss testified, admitted, that he never told anybody that those casters could be locked. And so when you got to the question of negligence, was it negligent not to tell someone about the locking feature on the casters, and had this man known that the forklift wouldn't have veered off and crushed the plaintiff, those are admissions of concrete facts. Here we're talking about the question of, you know, is a spectrum of, you know, presentation by this gentleman who came into the prompt care clinic suspicious of chest pain of cardiac origin. And that, you know, just stating that makes it clear that we're talking about a question of medical opinion, not a question of concrete fact. So I do think the court is, you know, absolutely correct that, number one, this is forfeited. You know, if you're going to take the position that something is a judicial admission and should be taken away from the jury so that they don't get to hear all the other conflicting evidence, then you've either got to bring that in, as you pointed out, if it was in the depositions, you would make that part of a pretrial motion, I think, motion to eliminate. You're going to fire this evidence based on judicial admissions. Or, you know, keep in mind, Dr. Cipolla was the first witness to testify. A plaintiff put him on as an adverse witness as his opening witness. All right. It's a question I asked counsel I want to ask you as well. Perhaps one would be more sympathetic to the failure to raise judicial admission at trial if there was a surprise about this. Right. Exactly. But did Dr. Cipolla? He was not impeached. You're right. During the course of his testimony, essentially what he said about what, you know, it is kind of odd and different what he noticed and what he didn't notice. Was that essentially what he had testified to in his deposition? It was. But, I mean, you know, again, also there's sort of cherry-picking statements by the doctor out of context. I mean, yes, he said chest pain can be indicative of a cardiac issue. But, of course, the question is where is the chest pain? And the chest pain in this gentleman's case was in the upper left part of his chest. And all the testimony, both by the experts and by Dr. Cipolla, was that cardiac chest pain is mid-sternum, and it's a different kind of pain. And when you talk about the chest pain, is it reproducible? And he was able to reproduce the chest pain on this gentleman by pressing, by palpating on his chest to trigger the pain that he was complaining about. And that's a strong indication that it's somatic pain or muscular pain as opposed to visceral pain, something being sent through the nervous system through the heart. So to suggest that any of these statements by Dr. Cipolla acknowledge, well, of course, some people say, yes, hypertension can be an indication of chest pain for cardiac origin. And he concedes. Was any objection ever made to the admissibility of the defense expert testimony? No, none whatsoever. The reason, of course, is if this comes through a judicial admission, then I don't think it would be pertinent. You're absolutely right. You would have objected and said, judge, this testimony should not be allowed. Dr. Cipolla has already made all these admissions. We shouldn't even be hearing about this. None of that was done. So I think the issue is completely forfeited. So was the term judicial admission actually used at the hearing of the post-trial motion? You know, to be candid with you, I don't remember from the transcript itself. Were you the trial lawyer? No, I was not. I'm strictly here for the appeal. But in the briefs, in their post-trial motion itself, yes, the term judicial admission was argued there. So I have to assume that the hearing was probably argued. But, you know, the point is, is that obviously I think it is forfeited. I think procedurally they went about this completely, you know, backwards if they really thought these were judicial admissions. The fact is, even if you go past the forfeiture issue, they're not judicial admissions because we're talking about matters of opinion, not concrete fact. The trial judge approached this appropriately by considering everything that was before her at the time when she did consider the post-trial motion. But, you know, all of this really just ignores the standard of review that we're here to apply. The standard of review requires the court to view the evidence in the light most favorable to the prevailing party in this case. And, you know, Mr. Osmond's argument, notwithstanding, he completely disregards all of the evidence that was favorable to this verdict. You know, when you look at the questions of was this chest pain suspicious of cardiac origin, what are you presented with? A 34-year-old man, all right? The expert said they had never seen a presentation, you know, an autopsy. This gentleman had 100 percent blockage in one artery, 99 percent, another 75 percent, and a third. In their entire careers, none of the experts at the trial had ever seen that. It's an extraordinary presentation in a 34-year-old to even suspect that a 34-year-old had coronary artery disease. He was a very active man. He was holding down three jobs, very physically active jobs. You know, as one expert explained, he was giving himself a stress test almost every day. He had no history of heart pain. He had no symptoms of angina. You know, all the experts agreed that angina is the combination of chest pain, mid-sternum, radiating pain into the arms, neck, or jaw. And when Mr. Hall presented, he had none of those symptoms. He had upper left chest pain. He said he had arm cramping and neck cramping prior at some other point in time, but he wasn't presenting with those symptoms at the time. So, again, not an indication of cardiac origin. He had no history of high cholesterol. He had no history of hypertension. Did Dr. Cipolla conceive that at the time his diastolic pressure was a little elevated? He said yes, it was, but that's often explained by someone who's in pain and comes to an urgent care clinic. The same was true with the heart rate. Was his heart rate elevated? Yeah, it was 107 when he came in, but by the time he took the EKG, it was 85. Well, the plain and essential argument seems to be that a doctor at this prompt care clinic should not be called upon to diagnose chest pains and whether or not a heart attack is occurring if certain circumstances present themselves. Why was the doctor's duty bound to, according to his own protocols at that clinic, to send this person to the emergency room? Why wasn't that met in this case? Well, I have two responses to that. First of all, the question of what the meaning or significance of the protocols was was also a matter of medical expert testimony. So the doctors, and this is a national standard of care, the doctors conceded that at every one of these urgent care centers, that's the issue, that we always want to first determine what type of pain we have, and if we determine, is this cardiac in origin, we make a referral to the emergency department. So the experts across the board were all clear that that was the standard of care, and they were evaluating the protocol in that light, and that was how they all understood it to begin with. So the latest experts wrote the opinion that enough was presented here to cause Dr. Cipolla to have referred this patient to the ER? Yeah, so it's a classic battle of the experts. Classic battle of the experts. Counsel, is it fair to say that in attempting to parse out these admissions, we're talking about the very things the doctor used when presented with symptoms in deciding what type of immediate care Mr. Hall might need, that those are being presented to us as admissions, when I think your argument is that those were the very factors the doctor was using to determine what type of care this patient would need? That's exactly right. I mean, when someone, you know, that's the other answer to my question. The first one is the question of what the protocols provide is a matter of expert opinion, how you interpret them, what you take them to mean. But the experts also explained that when someone comes in complaining of some symptom or pain or whatever, you have to assess what it is. I mean, you can't just say – I mean, Mr. Osmond gave the example of a man who walks in with a fork sticking out of his chest. Well, you know, that's fairly obvious. But this is a gentleman who came in who had been working all day moving heavy metal objects. What about EKG? How should that be viewed? The results of it or the – oh, well, again, the testimony was unequivocally clear on the defense side that this was not suspicious at all of cardiac origin, that it was a perfectly normal EKG. You know, there's two different things that happened with the EKG. One is they agreed that the readings that the EKG took were unfallible, they were perfectly accurate. Okay? But the next question is how do you interpret those readings, the, you know, T waves, S waves, Q waves, P waves? But the point is, is those have to be interpreted. The EKG machines are apparently programmed with a computer algorithm that if they see any deviation from what is considered to be ideal, they kick out a report that says something is abnormal. But that simply triggers the obligation on the part of the physician to look at the actual tracings and make an interpretation of his own. Is that what happened in this case? That's exactly what happened in this case. Now, the plaintiff argues that the EKG seemingly was enough in itself to cause Dr. Chicago to say, let's have this guy to the ER. You know, the two defense experts, we had both another urgent care physician from the University of Chicago and we had a cardiologist, I forget, I think he may have been from St. Louis, but those two physicians made it very clear that no, under those circumstances, they thought that Dr. Chipola read the EKG appropriately and that there was no indication of any. In fact, there's even one point in the evidence where you'll see that the EKG says that there's something, I forget what it was, I think it's a left atrial enlargement or something like that about this gentleman's heart, and Dr. Denton, who was the forensic pathologist that examined him, testified that that was wrong, that the EKG was wrong. It actually didn't appear on autopsy that he had that problem with his heart. The EKG indicated as its interpretation of the trace. The one who performed the autopsy? Dr. Denton was, yes. So, you know, I mean, you can go down the list, but, you know, there's so many different factors. I mean, in terms of when you're talking about ischemic type of problem with heart, it's something that, you know, it comes and goes, comes and goes. And in this case, this gentleman had constant pain. So your position is this was a battle of the experts, the jury was entitled to believe the defense experts, or at least believe them enough so the plaintiff didn't carry plaintiff's burden of proof? That's exactly right. You know, and now that we're here on appeal, you know, I think it's all the more important that plaintiff's brief and plaintiff's argument, although, you know, this was the same argument essentially that was given in closing the trial,  and I take it if the plaintiff had prevailed at trial on the same evidence, you'd have not much to argue because it would be a battle of the experts again. Yes. Had this verdict gone the other way and I were standing here arguing to you that the judgment was against the weight of the evidence or that the defense was entitled to a JNOB, you know, Mr. Rossman would be up here telling you, you've got to view the evidence in the light most favorable to me, and it supported my verdict. So, you know, I do think that you can fairly find that this whole argument about judicial admission is forfeited. I do think that even if it's not, you can reasonably find that these aren't judicial admissions by any stretch. These are not facts. These are opinions. And then when you go forward from that point and apply the standard of review, viewing the light most favorable to the verdict, there's ample evidence to support it. This is not a manifest weight problem. This is not a JNOB case. You know, Mr. Osmond has not argued any of the trial error issues that he raised. I don't know if the court would like me to address a few of those or not, unless I'm going to get a sir reply here. Well, you have no lights facing you, counsel. It's your turn. I guess all I would say to you at this point is that every one of the trial error issues that were raised all, of course, trigger a question of the trial judge's discretion. I don't think that you could fairly argue that each single one of those rulings that Judge Foley made, that you could look at that and say that no judge would ever rule this way. I don't think you could ever meet that standard on any of them across the board. You know, I think it's amusing that, you know, they argue in their brief that the locality rule should have been given as an instruction, and it was Mr. Osmond himself who, in the course of the argument, the jury instruction said, acknowledged this court's decision in Jackson v. Graham, which made it clear this is not a locality rule case, and said he felt itchy just arguing it. Felt what? Itchy. Itchy. Yes, which I assume meant didn't feel good about arguing it. You know, they complained about a juror who was on there, but they had a preemptory left. They complained about impeachment of one of our witnesses that the judge found wasn't impeaching. They didn't include in the record the deposition that they're relying upon for the impeachment. And the judge looked at three pages of deposition testimony and found it wasn't impeaching. So, you know, we've got kind of a consistent problem here with starting with this whole judicial admission argument of a failure to make a proper record. By the way, just regarding the excused jurors, one of the things about that, the juror being excused for cause, were all the preemptories exercised in this case? No. He had at least one left at the end. So the one juror he's complaining about more is he could have excused him with a preemptory. So, you know, this failure to follow up argument, you know, they stipulated prior to opening statements that it was okay for the defense to mention that Dr. Cipolla had advised the patient to follow up with his primary care physician after he left. They said that was okay. Now they're complaining that that was error. You know, and that's at page 1174. And then later on in the trial, Mr. Ginsky gets up and starts asking one of his own witnesses, I believe it was, about this failure to follow up and wasn't trying to say it's his own fault. And we objected. Because he's putting this into evidence that he's now claiming on appeal shouldn't have been in evidence. That's at page 2045. So, you know, I don't, I just, I think the appeal's a non-starter from the get-go. And we would ask that you confirm the judgment in favor of Dr. Cipolla and OSF. Thank you, counsel. Thank you. Mr. Osmond, any rebuttal, sir? Yes, sir. Okay. Let me say a few things to clarify. I was itchy about the locality rule because over my 40 years it normally wasn't me that was looking for its application. But that ties into what counsel said, which is not true. This isn't a national standard. This is a standard of care particular to the OSF scope of services, which is why when the experts were allowed to say, well, I wouldn't be suspicious, to imply to the jury that it's okay to ignore that Dr. Cipolla was suspicious. It can't be. Well, you saw what this court wrote in Jackson v. Graham. What, you know, this, you know, maybe this would apply a local standard if we were dealing in Rushville, Illinois. But this is blooming to normal. Well, I don't believe we even have an issue of that because nobody contested the standard of care. And in the brief, they give you the standard of care. Why do we need a locality rule then? Well, my thinking at the time was that because we have this local rule, which is inherent in the standard of care, which they conceded. There was no debate about whether or not there was, if you have suspicion, you must refer. So that's where it came up. I don't think that's dispositive. There are other things I'd like to address for you. Go ahead. Judicial admissions being discussed with the judges at 45 to 46, 47, 52. It's all throughout that. What's very important here is that. Is that the hearing on the post-trial measure? Yes, yes. And as far as the issue of 1202, there is no case law been presented to this court, nor have I found any, that says we waive anything. In fact, 1202 gives us the right to preserve it, and no one has provided the court with any rules, any law. Well, you've mentioned 1202 repeatedly, and I now have it in front of me. 1202B says, relief after trial may include the entry of judgment if, under the evidence in the case, it would have been the duty of the court to direct the verdict without submitting the case to the jury, even though a motion to direct the verdict was made. Correct. That's under the evidence of the case, meaning the evidence of the case at the time the case was tried, where you'd have to make your objection to improper evidence at that time. Well, I'm not objecting to improper evidence. I am now stating we have judicial admissions in the evidentiary record at trial, which I'm allowed to present as a basis for J&O cases. Counsel, let me be clear. The effect of a judicial admission is to render other evidence improper and to render arguments improper. Isn't that the case? I'm not contending that. I agree that it does, but the fact that they went ahead and put the evidence in does not change the effect of the law, of judicial admissions, meaning he was suspicious. He admitted it. Their admitted standard of care says admission equals referral. I don't think everything outside of that is a distraction. I don't think it changes anything that they went on to put other evidence in if, in fact, the evidence under the law of judicial admission in J&O v. under 1202 provides me relief and that that is our argument here. Go ahead.  Sure. The judicial admissions in this case are awareness. And whether we go with judicial admission or evidentiary, we then move to manifest weight. We have clear evidence he was suspicious and then proceeded to not refer but diagnose. On the face of the standard of care, admitted standard of care, that's a violation. No expert testimony from the defendants said that the standard of care was anything other than what they put in their brief to you before the court. All of counsel's arguments were glaringly to me, as it concerns Cipolla's conduct, confirms that Cipolla didn't just acknowledge symptoms of chest pain of cardiac origin. He went well beyond and acted as a cardiologist when he said, well, it's where the pain in the chest is and it's over here. And was the pulse elevated and said, therefore, tachycardia. But then it went down. Those are not things that a prompt care doctor should be weighing. And ultimately, he ruled them all out. And, Your Honor, you mentioned to counsel, what about the EKG? It would be different if the EKG was normal. And I was just arguing tachycardia, obesity, and those other factors, which I believe are evidentiary at the least and judicial at best. The fact that they took the EKG and decided he was going to ignore it because they're not always right. And the other foolish things he said about why he didn't just send him down the hallway. He went beyond his capacity. And the standard of care has to be read in light of that, that they didn't want exactly this. They didn't even want him to be there, but they show up anyway. The arguments before this court, I do believe strongly on JMOV, but I realize that relief is very scarce. I think it's a matter of record that manifests weight here. We have a doctor who's suspicious. He admits he's suspicious. The standard of care says suspicion equals referral. He didn't do that. It cost Jason Hall his life, and the wife and the two little children that are involved in this case need this case rectified. I think at the very least we get a second chance to put this together, and we, under the law that exists, either 1202 and manifest weight is certainly the least we deserve in this case. Thank you. Okay. Thank you, counsel. We'll take this matter to the press. We'll be in recess for a few moments.